# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT STRINNI and** | ) | |
| **JERI FLESCHERT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:08cv1628 TCM** |
| | ) | |
| **MEHLVILLE FIRE PROTECTION** | ) | |
| **DISTRICT, MISSOURI, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court[1] on a motion for summary judgment ("motion") [Doc. 52] filed by Mehlville Fire Protection District, Missouri ("District"); Aaron Hilmer, Bonnie C. Stegman, and Ed Ryan (each a member of the District's Board of Directors ("Board") and all collectively referred to as "Board Members"), and James J. Silvernail (Chief for the District, referred to as "Chief") (all collectively referred to as Defendants). Robert Strinni and Jeri Fleschert (Plaintiffs) filed opposition to the motion, and Defendants filed a reply in support of the motion. These parties[2] have filed statements of facts, declarations, affidavits, and exhibits in support of their positions on the motion.

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2] Although the Court granted a motion to intervene filed by the International Association of Firefighters Local 1889 - Professional Association of Firefighters of Eastern Missouri (Local 1889), that intervention was only for the limited purpose of entering into a protective order with Defendants. (See Docs. 34, 36.) Therefore, the intervenor is not a party for purposes of the summary judgment motion.

By a four count complaint, Plaintiffs seek monetary and equitable relief from Defendants for Defendants' suspension and then termination of Plaintiffs' employment with the District.[3] (Compl. [Doc. 1].) Specifically, Plaintiffs pursue two federal law claims under 42 U.S.C. § 1983 for Defendants' alleged violations of Plaintiffs' First Amendment rights to free speech and free association[4] (Counts I and II, respectively); as well as two state law claims under Sections 105.500 *et seq.* of the Missouri Revised Statutes for Defendants' alleged violations of Sections 8, 9, and 29 of Article I of the Missouri constitution (Count III) and alleged violations of Section 105.510 of the Missouri Revised Statutes (Count IV). (Id.) Each Defendant filed a first amended answer in response to the complaint, in which each Defendant denies liability and sets forth numerous affirmative defenses. (First Am. Answers [Docs. 47, 48, 49, 50, 51].) The four individual Defendants, the Chief and three Board Members, are sued in their individual and official capacities.

## **Background**

The undisputed material facts[5] reveal the following.

_____

[3] In their complaint, Plaintiffs occasionally allege that Defendants have acted against Plaintiffs "and other District employees similarly situated." (See, e.g., Compl. ¶¶ 45, 55, 57 [Doc. 1]; see also id. ¶ 42, which refers to Defendants' conduct as imposing "unconstitutional restraints on the free speech rights of the plaintiffs and other District employees.") Plaintiffs have not yet requested certification of a class.

[4] Although the Fourteenth Amendment is mentioned in their complaint, see, e.g., Compl. ¶¶ 40, 43, 53, 56, 58 (Doc. 1), Plaintiffs are not pursuing any Fourteenth Amendment claim in this lawsuit, Pls.' Opp'n Defs.' Mot. Summ. J. at 4 n.2.

[5] These undisputed facts are taken either from the allegations in the complaint (Doc. 1) to the extent they are admitted by Defendants in their First Amended Answers (Docs. 47, 48, 49, 50 and 51) or from statements in Defendants' Statement of Facts (Doc. 53 at 4-45) to the extent they are

2

Plaintiff Strinni was hired by the District as a fire fighter in 1994 and remained a District employee until his discharge in June 2008, attaining the position of Engineer. (Compl. ¶ 14 [Doc. 1]; Defs.' Statem. Facts ¶ 223 [Doc. 53].) Strinni did not have an employment contract with the District, could have voluntarily terminated his employment with the District at will, and was never promised employment for a specific duration of years. (Defs.' Statem. Facts ¶¶ 58, 59, 60 [Doc. 53].)

Plaintiff Fleschert was hired by the District as a paramedic in August 1985 and remained a District employee until her discharge in June 2008, attaining the position of Lieutenant. (Compl. ¶ 15 [Doc. 1]; Defs.' Statem. Facts ¶¶ 69, 70, 223 [Doc. 53].) Fleschert did not have a written employment contract with the District and acknowledges she was an "at will" employee of the District. (Defs.' Statem. Facts ¶ 75 [Doc. 53].)

Plaintiffs had no disciplinary action taken against them prior to their suspensions and terminations in 2008. (Pls.' Statem. Facts ¶¶ 1, 2 [Doc. 59-2 at 78].)

Defendant District is a political subdivision of the State of Missouri that provides emergency medical, fire prevention, advanced life support, water and heavy duty rescue, and inspection services for several cities and townships, as well as a portion of an unincorporated area, in south St. Louis County, Missouri. (Defs.' Statem. Facts ¶¶ 1, 2 [Doc. 53].) The

---

admitted by Plaintiffs (Doc. 59-2 at 1-78). Additionally, for purposes of summary judgment, Defendants "admit to all of Plaintiffs' 'additional facts.'" (See page 25 of Defs.' Reply [Doc. 62 at 25]; and, for Plaintiffs' additional facts, Doc. 59-2 at pages 78-87.) Therefore, the Court will also consider Plaintiffs' additional facts in resolving the summary judgment motion.

District employs 130 individuals in seven stations or Houses that are staffed twenty-four hours a day. (Id. ¶¶ 3, 4.) There are three rotations of staff, designated A Crew, B Crew, and C Crew, with each crew supervised by a Deputy Chief. (Id. ¶ 5.) Within each crew, several individuals work the swing shift, which means they move between houses to fill vacancies. (Id. ¶ 6.)

Approximately ninety percent of District's employees or a total of 115 of the District's employees, belong to Local 1889 (or "Local"), an affiliate of the International Association of Fire Fighters, AFL-CIO, CLC. (Defs.' Statem. Facts ¶¶ 9, 14 [Doc. 53].) Fleschert was a member of Local 1889 since about 1985, and has been the Local's Secretary since late 2006 or early 2007. (Id. ¶¶ 13, 71, 78.) Strinni was a member of Local 1889 throughout his tenure with the District, was elected Secretary of the Local in 2003, was elected President of the Local in 2006, remained as President until late 2008, and, as President, became the Local's collective bargaining representative in negotiations with the Board. (Id. ¶¶ 63, 64, 65, 13; see also Strinni Decl. ¶ 29 [Pls'.].) The Local was told it was welcome to submit to the Board proposals regarding employment issues; however, the Board has not adopted any of the Local's proposals. (Defs.' Statem. Facts ¶¶ 55, 53 [Doc. 53].) Any meetings between Strinni, as President of Local 1889, and the Board to discuss employment issues took place in public sessions. (Id. ¶ 67.)

Defendant Silvernail has been Chief of the District since April 25, 2005. (Compl. ¶ 13 [Doc. 1]; Defs.' Statem. Facts ¶¶ 45, 46 [Doc. 53].) As part of his responsibilities as Chief of the District, Silvernail may suspend employees with pay. (Defs.' Statem. Facts ¶

48 [Doc. 53].)  In his role as Chief of the District, Silvernail reports directly to the District's three-member Board, whose members are elected by voters in the District.  (Id. ¶¶ 47, 15.)

The current Board consists of Defendants Hilmer, Stegman, and Ryan.  (Id. ¶ 17.) Hilmer was elected to the Board on April 5, 2005, and is the Board's Chairperson.  (Id. ¶ 18; Compl. ¶ 10 [Doc. 1].)  Stegman was also elected to the Board on April 5, 2005, and is the Board's Treasurer.  (Compl. ¶ 11 [Doc. 1]; Defs.' Statem. Facts ¶ 18 [Doc. 53].)  Ryan was elected to the Board in April 2007, and is the Board's Secretary.  (Compl. ¶ 12 [Doc. 1]; Defs.' Statem. Facts ¶ 19 [Doc. 53].)  The Board Members have voted to change the District's pension plan from a defined benefit plan to a defined contribution plan, to change the District's disability benefit contract, to hire individuals who were certified as both fire fighters and paramedics (referred to as "cross-trained employees"), and to give raises to cross-trained employees.  (Id. ¶¶ 22, 23, 25.)  Some District employees expressed concerns that these measures had a negative impact on employees.  (Pls.' Add'l Facts ¶ 27 [Doc. 59-2].)  Among other things, the Board is responsible for all employee discipline beyond suspension with pay.  (Defs.' Statem. Facts ¶ 48 [Doc. 53].)

In early 2007, the Local campaigned on behalf of a Board candidate other than Ryan. (Pls.' Add'l Facts. ¶ 4 [Doc. 59-2].)

In February 2007, Hilmer was quoted in a local newspaper article as making the following comments about a lawsuit Local 1889 had filed against the Board:

> [T]hat shouldn't surprise anybody because, after all, this group and the puppets they run for office specialize in wasting people's money. . . . But I think this shows that they thought lawsuits, nasty letters and low-lifes sent to intimidate

could make us roll over and stop the march of reform. Well, that's not going to happen.

(Id. ¶ 15.) Hilmer further stated in the article:

> I hope and have hoped that some rational employees will step forward to talk to the [B]oard on real-world problems facing the [Fire D]istrict. I know it's possible because [Stegman] and I did it at South County Fire Alarm where we worked with Local 1889 employees to right the ship for the betterment of both parties. But unfortunately, it seems that these types of individuals are not in the majority at Mehlville. . . . [Rather, in Hilmer's estimation, bargaining unit members wanted to] derail the train by lawsuits and harassment.

(Id. ¶ 17.)

After Ryan's election, an op-ed piece authored by Strinni was published in a local newspaper explaining to the public why Local 1889 had supported the candidate opposing Ryan. (Id. ¶ 5.)[6] In an April 18, 2007, newspaper article Hilmer described the Local's

---

[6] That April 18, 2007 op-ed article stated:

Union to continue efforts until citizens know true story about [the District]

I read in your most recent issue of the Call an article describing the amount of money that . . . Local 1889 . . . spent on recent efforts to elect Mr. Dennis Skelton to the . . . [B]oard.

This money came out of the pockets of the employees and was used in an effort to inform the taxpaying residents of the district exactly what is going on. The current [B]oard members have used this publication as a platform for their personal agenda of tax reform.

In the process of doing so, the stories that have appeared in the Call have been riddled with half-truths and, in some cases, outright lies about the men and women of the . . . District.

Stories about increases in services, salary and benefits of employees or reductions in tax rates have been greatly exaggerated and have the readers totally confused as to the real issues that are going on within the [D]istrict.

campaign in support of the unsuccessful Board candidate as "a smear campaign against me personally," and as "nothing more than a tirade about Aaron Hilmer." (Id. ¶ 16.)

During an August 2007 Board meeting, Plaintiffs attempted to present the Local's proposals relating to employee pay and benefits. (Id. ¶ 6.)

On August 8, 2007, Hilmer made statements in a local newspaper indicating the District's employees had not done anything to help the Board with its effort to make the District a better place, by hiring more qualified people, giving the community more services, and dealing with problems everyone faces, such as health care and pension issues, but rather had pursued lawsuits, personal attacks, and "circus stunts." (Id. ¶ 18.)

In December 2007, Hilmer provided an interview to a local newspaper which reported that he stated:

"Contrast this to the first conversation I had with the leader of Mehlville's

---

The decision of the local to participate in the efforts of Mr. Skelton came just two weeks before the election and after a well-respected businessman was harassed at work and at home and was forced to withdraw his name from the ballot. Who would benefit most from this kind of action, and whom do you call bullies and thugs?

I am encouraged by the number of persons who we informed about the truth who came and voted for Mr. Skelton. Our efforts will continue until the residents see the true story about their fire district.

One day, they will know the truth – but until then, the men and women of the . . . Fire . . . District will continue to serve you and yours at your time of need.

Bob Strinni,
president
Mehlville IAFF Local 1889

(Pls.' Ex. 58 [Doc. 59-58].)

firefighters' union," [Hilmer] said, referring to then-[District] Local 1889 President Chris Francis. "He called to see what the make and model of my car was so they could replace the windshield that was smashed out the previous evening. Unfortunately, that was the high point of the behavior of their leadership and it was straight into the gutter from there.

"I subscribe to the old saying that an open hand accomplishes more than a closed fist or in Mehlville's union's case, a baseball bat . . . Why the employees continue to break their backs so their incompetent union bosses can make $35,000 a year to drive them into the ground is beyond me. But that's a choice they make when it comes time to elect them, and I think it's an interesting contrast between how the leadership at fire alarm 1889 has worked and how the leadership at Mehlville [District] has worked.

(Id. ¶ 19; see also Pls.' Ex. 45.)

Martin Becker ("Becker") was hired by the District in August 2007 as a cross-trained employee. (Defs.' Statem. Facts ¶ 79). Becker joined Local 1889 in November 2007. (Id. ¶ 82.)

Becker's brother, Michael Becker, was acquainted with Defendant Board Member Hilmer. (Id. ¶ 80.) At some point in late 2007, Fleschert had heard a rumor that Becker's brother was friends with Hilmer. (Id. ¶ 86.) She wanted to know whether that rumor was true because she considered "any friend of . . .Hilmer's [to be] an enemy of hers." (Id. ¶ 92.) Fleschert accessed the Secretary of State's website to determine what political contributions Becker's brother had made and discovered that he had made contributions to the same school board candidates that Defendant Hilmer had supported. (Id. ¶ 84.) In late or early 2008, while they were alone in an ambulance, Fleschert asked Becker about his brother's affiliation with Hilmer. (Id. ¶ 93.) Becker told Fleschert that his brother did not know Hilmer. (Id. ¶ 96.) In late 2007 or early 2008, Strinni also asked Becker about his brother's affiliation with

the Board. (Id. ¶ 102.) On another occasion Becker responded to a question by another District employee, Chris Francis, who is a former President of Local 1889 and still employed by the District, that Becker's brother did not know Hilmer. (Id. ¶¶ 100, 101.) Becker denied his brother's association with Hilmer because he knew "that the employees of the District did not like . . . Hilmer" and he did not want to be associated with Hilmer before his co-workers got a chance to know him personally. (Id. ¶ 97.)

Various issues, sometimes relating to District personnel, have been discussed on a blog called South County Truth Spot. (Id. ¶ 35.) Plaintiffs have no knowledge that any individual Defendant, or any current member of the District's administration, has contributed to this blog. (Id. ¶¶ 36, 37.)

Jim Stonebraker, a resident of Mehlville, Missouri, who is not a District employee, contributes articles to this blog. (Id. ¶ 38.) Strinni believes Stonebraker is affiliated with the Board and adverse to the interests of Local 1889. (Id. ¶ 40.) Fleschert believed that Stonebraker "was a direct pipeline to . . . Hilmer" and there are things "said in the . . . House that the Board doesn't need to know about." (Id. ¶ 104.) Fleschert received information that Stonebraker and Becker were friends. (Id. ¶ 90.)

In early 2008, Strinni believed that a member of Local 1889, specifically Becker, was passing information about the Local to the Board. (Id. ¶ 105.) To confirm his suspicions that Becker was a "mole," Strinni told Becker that Local 1889 was picketing a tavern where Stonebraker's band was scheduled to play. (Id. ¶ 106.) Becker agreed to attend the picket and then asked other District employees if they planned to attend and they told him they

were not aware of any picket . (Id. ¶¶ 107, 108.) Strinni told Becker about the picket to "see whether . . . Becker was going to blab to the Board." (Id. ¶ 109.) Strinni also instructed another District employee to be careful about what was discussed around Becker. (Id. ¶ 111.)        In February 2008, Strinni expressed his concerns about the Board's hiring practices, the Board's changes to the employee pension plan, and other Board activities in a lengthy interview with local media. (Pls.' Add'l Facts ¶ 12 [Doc. 59-2].) In particular, Strinni stated that, as a result of the Board's changes and policies, the District had lost qualified, long-term employees to other fire protection districts and the quality of replacement applicants had diminished. (Id. ¶ 13.) Specifically, Strinni stated:

> We haven't had a raise in six years . . . . How are we going to continue to retain the people that we have and attract new employees? Like I said earlier, if you look at our benefits – the worst sick leave, the worst vacation. I mean two vacation days for some of these new people and they can go somewhere else and get all of that stuff better, why would they come here? So then you're going to get the lower-entry people . . . I had one new guy look at me and tell me it's the first [time] I've been on a fire truck.

(Id. ¶ 14.)

On March 28, 2008, Strinni and John Schindler entered the bunk room at 2 House and saw two cell phones resting on different night-stands. (Defs.' Statem. Facts ¶ 113 [Doc. 53].) Strinni picked up the phones because he wanted to see whose telephone numbers were programmed into the phones and find out who was talking to the Board. (Id. ¶ 114.) The first phone Strinni picked up contained Stonebraker's telephone number, and Strinni told Schindler the phone had Stonebraker's number in it. (Id. ¶ 115.) Strinni then picked up the second phone, scrolled though the numbers, and determined that it did not contain

information of interest to him.  (Id. ¶ 116.)  Strinni then deduced that the phone containing

Stonebraker's number belonged to Becker and the second phone belonged to Tyler Robinson.

(Id. ¶ 119.)  Neither Becker nor Robinson had given Strinni permission to investigate their

phones.  (Id. ¶ 120.)  Strinni admits what he did with these two phones was wrong and not

necessary to the performance of his job responsibilities.  (Id. ¶ 122.)  Fleschert also believes

this conduct by Strinni was inappropriate and wrong.  (Id.)

Strinni and Becker subsequently talked, and Becker understood that Strinni would

"somehow get" Becker if Becker "didn't start agreeing with the Union."  (Id. ¶ 131.)

On March 30, 2008, Becker met with Deputy Chief Dave Waser, who was the

supervising officer for A Crew, which included Strinni and Becker.[7]  (Id. ¶¶ 134, 135; see

also Pls.' Ex. 24 [Doc. 59-24].)

---

[7] Plaintiffs' Exhibit 24 (Doc. 59-24) consists of notes written by Deputy Chief David Waser.
In addition to mentioning the March 30, 2008, meeting Waser had with Becker, those notes state that
on April 2, 2008, Waser

> met with Chief Silvernail, Assistant Chief Mossotti, and Carla Juelfs HR and advised
> them [in relevant part] of . . . [his] conversation with Becker [on March 30, 2008,
> about a conversation Becker had with Strinni about Becker's brother's role in a school
> board election and about whether Becker had talked to Stonebraker about issues in
> the firehouse].  They as a group, felt there had not been harassment, [Becker] was not
> in a protected class, and the situation was unavoidable.  Chief Silvernail stated that
> it was the sad result of people playing politics, and when that happens someone
> usually gets burned.  I  advised them I would continue to monitor the situation and
> to my knowledge no other incidents had occurred.

Id.  In his deposition, Waser also testified that he spoke with the Chief and Mossotti on April 2, 2008,
in relevant part, about the conversation he had had with Becker on March 30, 2008.  (Pls' Ex. 7 at
23-31 [Doc. 59-8].)  Waser's notes and deposition testimony do not indicate whether he,  Silvernail,
Mossotti, or Juelfs knew as of April 2, 2008, that Strinni had looked at Becker's cell phone.

In April 2008, Hilmer assisted the election campaign of Mehlville School Board candidate Chris Brown.  (Pls.' Add'l Facts ¶ 8 [Doc. 59-2].)  Becker's brother, who did not live in the Mehlville School District, was the treasurer of Brown's election campaign.  (Id.)  Local 1889, led by its Executive Board which included Plaintiffs, campaigned on behalf of other school board candidates.  (Id. ¶ 9.)  The Local's activities on behalf of candidates included working the polls on election day.  (Id.)  Brown was not elected to the school board.  (Id. ¶ 10.)

On April 13, 2008, Fleschert and Becker were together in an ambulance returning from a call when they engaged in a conversation.  (Defs.' Statem. Facts ¶ 139 [Doc.53-1] .)  Fleschert told Becker she knew that his brother had contributed to the campaigns of members of the Board, he would be taking the heat from District employees for his brother's involvement with the Board, and she knew that he had Stonebraker's number in his cell phone.  (Id. ¶¶ 142, 143, 144.)  Fleschert intended her comments to Becker to "suggest or imply to [him] that [being friends with Stonebraker] was a bad thing [and] that any friend of . . . Stonebraker [was her enemy and] an enemy of . . . the [Local]."  (Id. ¶ 146.)  When Becker responded that it was not right for somebody to look through his cell phone, Fleschert simply said, "Oh, well."  (Id. ¶ 147.)

On April 14, 2008, Becker's brother told Stonebraker that Becker was being harassed at work and his cell phone had been taken.  (Id. ¶ 152.)  Stonebraker advised Hilmer of Becker's treatment by District employees; and Hilmer initially responded that he did not want to be involved with the situation, that Becker should report the problem to his immediate

supervisor.  (Id. ¶¶ 153, 154.)[8]

On April 16, 2008, Chief Silvernail, Assistant Chief Steven Mossotti, and Deputy Chief Waser met with Becker.  (Id. ¶ 158.)  In part, Becker stated Fleschert made him uncomfortable because she had asked him about his political affiliation and about Stonebraker's telephone number in his cell phone.  (Id. ¶ 161.)  Chief Silvernail understood Becker was uncomfortable that others knew he had Stonebraker's phone number because "there was a dislike between the firefighters and Stonebraker."  (Id. ¶ 162.)  Becker said he did not want anybody to get in trouble and that he merely wanted to stay out of 2 House.  (Id. ¶ 163.)  After the meeting, Chief Silvernail called Hilmer to report Becker's allegations and to advise Hilmer that "we ha[ve] a problem."  (Id. ¶ 164.)

On April 17, 2008, Chief Silvernail advised the Board for the first time that Becker had complained of harassment and intimidation.  (Id. ¶ 165.)  Upon hearing these allegations, the Board was concerned, considered the allegations serious, and believed the District needed to get to the bottom of the situation.  (Id. ¶ 166.)

On April 22, 2008, the Board formally adopted Resolution 4-08, which called for an investigation into workplace harassment.  (Id. ¶ 167; Pls.' Compl. ¶ 19 [Doc. 1].)  This

---

[8] In Defendants' Statement of Facts, Defendants state that, after receiving Stonebraker's call, Hilmer called Chief Silvernail and advised him of the allegations of harassment. (Defs.' Statem. Facts ¶ 155 [Doc. 53-1].)  This is based on Hilmer's deposition testimony that he called the Chief within twenty-four hours after Stonebraker's call.  (Defs.' Ex. 2, Hilmer Dep. at 71 [Doc. 53-2].)  Plaintiffs dispute this Statement of Fact in part on the basis Hilmer did not testify to the reason for his changed opinion, Silvernail reported that Stonebraker told him of Becker's allegations, and Silvernail testified in his deposition that when he notified Hilmer of the allegations, Hilmer did not indicate he already knew about them.  (Pls.' Resp. Defs.' Statem. Facts ¶ 155 [Doc. 59-2].)

Resolution states:

> WHEREAS, it is the intent of the Board of Directors of the Mehlville Fire Protection District to be responsible to the taxpayers and the employees of the District,
>
> NOW THEREFORE, be it resolved by the Board of Directors of the Mehlville Fire Protection District of St. Louis County, Missouri, as follows:
>
> 1) That the Mehlville Fire Protection District has voted to initiate an investigation into personnel issues pertaining to workplace intimidation and harassment.
>
> 2) That each and every employee of the Mehlville Fire Protection District shall comply with said investigation. If not, each employee may face discipline up to and including termination.

(Defs.' Statem. Facts ¶ 168 [Doc. 53].)

Upon the District's attorney's recommendation, the Board voted to hire Tom Moore ("Moore") of Metro Securities Consulting ("Metro Securities") to conduct the investigation. (Id. ¶ 169.) Metro Securities is a private security company which provides workplace investigations. (Id. ¶ 178.) The District's attorney and Hilmer met with Moore and explained the nature of the investigation before Metro Securities initiated the investigation. (Id. ¶ 179.) Moore testified during his deposition that as a result of this meeting, he

> knew that . . . a couple [of] people had verbally harassed and intimidated some other employees and . . . the basic crux of it was that the newer people that were hired were looked down upon and were intimidated and harassed because they were cross-trained. Apparently that created some animosity between firefighters versus these new hybrids.

(Pls.' Add'l Facts. ¶ 35 [Doc. 59-1].)

During a closed session, the Board discussed Chief Silvernail's interview with Becker

and then voted unanimously to suspend Strinni and Fleschert with pay. (Defs.' Statem. Facts ¶ 170 [Doc. 53-1].)

On April 23, 2008, Strinni and Fleschert were suspended with pay, and advised they were barred from District property. (Id. ¶¶ 171, 173; Pls.' Ex. 27.) During their suspension, Plaintiffs were not prohibited from calling or meeting with members of Local 1889. (Defs.' Statem. Facts ¶ 176 [Doc. 53-1].)

On April 24, 2008, Moore began a series of interviews with various District employees relating to workplace harassment and intimidation. (Id. ¶ 182.) These interviews were recorded and then the interview recordings were given to the Board to review. (Id. ¶ 196.) The Board members reviewed the recordings of the interviews. (Id. ¶ 197.) Moore did not provide the District or any of the Board members with a report summarizing any conclusions. (Id. ¶ 181.)

Moore first interviewed Becker. (Id. ¶ 183.) Becker told Moore of Fleschert's conversation with him in the ambulance, of Strinni's repeated questioning of his and his brother's political affiliation, of Strinni's mention of a fake picketing event, of Strinni taking Becker's cell phone without Becker's permission, and of Strinni telling other District employees that Becker had Stonebraker's telephone number in his cell phone. (Id. ¶¶ 185, 186.) Becker told Moore he felt uncomfortable working at 2 House because he was "being talked about, back-stabbed, and set up to fail," and he had requested a transfer to a new House. (Id. ¶ 187.) Becker also confided to Moore that he was "definitely worried personally" about what would happen to him if any action was taken against Strinni and

Fleschert because they "have a huge following" among District employees. (Id. ¶ 188.) When Moore asked Becker how he felt about returning to work, Becker stated he "was nauseous . . . it was hard to focus," and it affected his "mental capacity on calls" because his attention was diverted to "trying to save face all the time" and he constantly "ha[d] to go fix" the rumors. (Id. ¶ 189.)

On May 6, 2008, Moore interviewed Strinni and Fleschert. (Id. ¶¶ 190, 192.)

On May 8, 2008, the Board voted unanimously to suspend Strinni and Fleschert without pay pending completion of the investigation. (Id. ¶ 200; Pls.' Compl. ¶ 30 [Doc. 1].)

Moore also interviewed nine other District employees, including Tim White and John Schindler. (Defs.' Statem. Facts ¶ 203 [Doc. 53].) During his interview, White characterized Becker "as the Union's new 'whipping boy'" and raised concerns about safety at the District. (Id. ¶ 195.) In his deposition, Moore testified that, as a result of the initial meeting with Hilmer and the District's attorney, and White's interview, Moore "was left with the impression [that] . .. 'it seemed like the people that were in the union and held positions in the union were the ones that were primarily responsible for the intimidation and harassment that had taken place.'" (Pls.' Add'l Facts ¶ 35 [Doc. 59-1].)

On June 13, 2008, the Board voted unanimously to terminate Strinni's and Fleschert's employment with the District, and to suspend two other employees for periods of one or two days. (Defs.' Statem. Facts ¶¶ 206, 213 [Doc. 53-1]; Defs.' Ex. 40 [Doc. 53-40].) The employee suspended for two days had made threatening remarks about Hilmer during his interviews. (Id. ¶ 214.)

The other employee, Schindler, was suspended for failing to initiate proper discipline against Strinni upon learning that Strinni had invaded Becker's cell phone.  (Id. ¶ 217.)  At the time of his one-day suspension, the Board did not know that Schindler had been with Strinni when Strinni looked through Becker's cell phone.  (Id. ¶ 219.)  Until his deposition in this lawsuit, Schindler did not admit to being with Strinni when Strinni looked through Becker's cell phone, because he was afraid he could lose his job.  (Id. ¶ 220.)  Schindler knew it was wrong of Strinni to pickup Becker's cell phone and that it was an invasion of privacy.  (Id. ¶ 221.)

On or around June 16, 2008, Plaintiffs were advised of their termination for violation of the District's anti-harassment policy.  (Id. ¶ 223; Pls.' Compl. ¶ 32; Defs.' Exs. 41, 42.)  The Board did not publish the details of Plaintiffs' termination but a newspaper was given redacted copies of the interview transcripts after the newspaper threatened to seek the documents pursuant to Missouri's Sunshine Law.  (Defs.' Statem. Facts ¶ 210.)

Since his termination, Strinni has been working construction jobs.  (Id. ¶ 225.)  Since her termination, Fleschert has been employed full-time as a clinical supervisor at a hospice, and has not applied for any job with another fire protection district.  (Id. ¶¶ 228, 229.)

Chief Silvernail never discussed the investigation with Moore or any other Metro Security representatives; did not read or watch any of the taped interviews; and had no knowledge of who was interviewed.  (Id. ¶ 240.)  Chief Silvernail was not asked to and did not participate in any of the discussions with the Board about Plaintiffs' discipline, and was not asked his opinion about the Board's decision to terminate Plaintiffs' employment.  (Id.

¶ 238.)

Stonebraker published on the South County Truth Spot blog several submissions criticizing or providing sensitive information about Strinni. (Pls.' Add'l Facts ¶¶ 22-26.)

The District's Employee Manual of Policy and Procedure 2007[9] ("EMoPP") includes an anti-harassment policy and a disciplinary policy which state, in relevant part, that:

> the Mehlville Fire Protection District will not tolerate harassment of any employee by any person, including any supervisor, co-worker, vendor, or any other third party . . . . The Mehlville Fire Protection District will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with a person's work performance, or that creates an intimidating, hostile or offensive working environment.
>
> *    *    *
>
> [I]f the improper behavior . . . is deemed to be of such a nature that the verbal warning or written reprimand is inappropriate, then suspension, loss of pay, demotion or dismissal may be warranted. This phase of discipline is generally used to address very serious and/or repeated job performance issues.

(Defs.' Statem. Facts ¶ 230 [Doc. 53]; see also Defs.' Ex. 11, EMoPP at 46 and 39 [Doc. 53-11].)[10]

---

[9] The EMoPP includes the notation "Adopted 9/26/2007 Rev 8/08." EMoPP, Defs.' Ex. 11 [Doc. 53-11]. The Court understands this notation means the EMoPP was adopted on September 26, 2007, before the Plaintiffs' discipline was imposed, and was revised in August 2008, after Plaintiffs' terminations. No party raises an issue regarding the propriety of considering any provision of the EMoPP in this case, and therefore the Court will consider the application of its relevant provisions in resolving the summary judgment motion.

[10] The terms of the District's Progressive Disciplinary Policy provide: "a method of imposing discipline in steps where a first offense results in a lesser punishment and subsequent offenses receive progressively harsher penalties." Defs.' Ex. 11, EMoPP at 38 (Doc. 53-12 at 38). "Whenever an employee does not adhere to the rules or meet reasonable standards of performance, it is the obligation of each Officer/Supervisor to initiate the appropriate disciplinary action." Id. An "Officer/Supervisor" is defined as "the Chief of the District, Assistant Chief, Deputy Chief and Fire

The District's Administrative Staff handled other complaints of harassment and intimidation without informing the Board of the conduct. (Defs.' Statem. Facts ¶ 243 [Doc. 53]; see also Pls.' Add'l Facts ¶ 34; Pls.' Exs. 31, 32, 34, 35 [Docs. 59-31, 59-32, 59-34, 59-35].)

For their First Amendment freedom of speech claim under 42 U.S.C. § 1983,

_____

Marshal." Id. The Progressive Disciplinary Policy further provides that "[t]he Officer/Supervisor shall conduct an investigation in order to determine if disciplinary action is warranted," allows "[t]he District [to] bypass certain phase(s) of the policy as warranted by the nature and severity of the offense," and specifies certain information required in [a]ll written documents regarding disciplinary action." Id. at 38-39.

The Progressive Disciplinary Policy provides for the imposition of verbal counseling before consideration of a written reprimand or suspension with loss of pay, demotion or dismissal, unless the "improper performance or behavior is deemed" to be "too severe for a verbal counseling" or "of such a nature that the verbal warning or written reprimand is inappropriate." Id. at 39. "Actions taken in the [verbal] counseling phase [or in the written reprimand phase] are not appealable beyond the Chief of the District." Id. The Board may decide to pursue a matter involving a written reprimand after the reprimanded employee notifies the Board. Id. The disciplinary phase involving suspension with the loss of pay, demotion or dismissal "is generally used to address very serious and/or repeated job performance issues" and "may result from a serious violation of established rules or from a continuing inability or unwillingness to follow the established rules of the . . . District." Id.

The Chief is responsible for recommending discipline involving loss of pay, demotion, or dismissal under the District's Progressive Disciplinary Policy. Id. Specifically, that Policy states: "If, after reviewing the facts and considering the employee's work record, it is determined that suspension with loss of pay, demotion or dismissal is the appropriate action, then the Chief of the District shall recommend such disciplinary action to the Board of Directors." Id. Written notice of such a recommendation is provided to the employee, with the employee having the ability to challenge the recommendation through a hearing before the Board. Id. at 40. The Progressive Disciplinary Policy also provides that "[t]he Board shall have the right to affirm, reverse or modify the recommendation of the Chief of the District. The Board's decision shall be final and binding subject to all remedies provided by law." Id.

Although the parties did not expressly include these Progressive Disciplinary Policy provisions as part of their agreed facts, these provisions are within the EMoPP that the parties rely on in support of their positions on the summary judgment motion.

Plaintiffs allege they have spoken out as citizens and as representatives of Local 1889 and its members on matters of public concern, specifically, the fire department's operations, employee morale, working conditions, compensation and benefits, and contract negotiations. (Pls.' Compl. ¶ 40 [Doc. 1].) As a result of and in retaliation for these speech activities, Plaintiffs allege, Defendants acted separately and jointly to suspend, reprimand, harass, terminate, and silence Plaintiffs, and to bar them from District property. (Id. ¶¶ 41, 47.) Additionally, Plaintiffs allege Defendants have adopted and applied policies and practices that impose unconstitutional restraints on Plaintiffs' free speech rights, including barring Plaintiffs from the District's fire stations and other property, which restricts Plaintiffs' communications with District employees and Local members about the provision of fire and rescue services. (Id. ¶¶ 42, 45.)

For their First Amendment freedom of association claim under 42 U.S.C. § 1983, Plaintiffs allege that, in their roles as President and Secretary of Local 1889, they "have acted as leaders, and active spokespersons for th[e Local] and its members" and Defendants have responded by engaging in "efforts to silence the [P]laintiffs and bar them from the District's property" and to deny their employment rights and benefits. (Id. ¶¶ 53, 54, 58, 59.)

For their state constitutional claims in Count III, Plaintiffs allege that public employees have the rights to free speech and free association, as well as a right to organize and bargain collectively through representatives of their own choosing, as provided by Sections 8, 9, and 29, respectively, of Article 1 of the Missouri Constitution. (Id. ¶¶ 63, 64.) Plaintiffs further allege that, as a result of and in retaliation for their positions as leaders in

the Local and their exercise of those state constitutional rights, Defendants acted separately and jointly to deny Plaintiffs those state constitutional rights through the discipline of Plaintiffs, efforts to silence Plaintiffs, and prohibitions against Plaintiffs' access to Defendants' property. (Id. ¶¶ 66, 68.)

For their state statutory claims in Count IV, Plaintiffs allege that Section 105.510 of the Missouri Revised Statutes gives certain public employees, including fire fighters, the right to form and join labor organizations and to present proposals regarding conditions of employment to a public body through a representative of their choosing. (Id. ¶ 71.) As a result of and in retaliation for their positions as leaders in the Local and their exercise of those statutory rights, Plaintiffs allege, Defendants acted separately and jointly to deny Plaintiffs those state statutory rights through the discipline of Plaintiffs, efforts to silence Plaintiffs, and prohibitions against Plaintiffs' access to Defendants' property. (Id. ¶¶ 72, 73.)

Defendants move for entry of summary judgment in their favor on each of Plaintiffs' four claims. (Defs.' Mot. Summ. J. [Doc. 52].) With respect to the First Amendment claims, Defendants argue Plaintiffs cannot establish their *prima facie* case because they cannot show either that they engaged in conduct protected by the First Amendment or that the adverse employment actions taken against them were motivated by any conduct protected by the First Amendment. Assuming Plaintiffs are able to establish a *prima facie* case of retaliation on the First Amendment claims, Defendants urge they are entitled to entry of summary judgment on those claims because Plaintiffs' suspensions and terminations were based exclusively on legitimate, non-discriminatory reasons. Finally, Defendants contend that Plaintiffs cannot

show that Defendants' legitimate, non-discriminatory reasons for Plaintiffs' suspensions and terminations were pretextual and, therefore, Defendants are entitled to entry of summary judgment in their favor on Plaintiffs' First Amendment claims.  For the state constitutional claim in Count III, Defendants contend they are entitled to entry of summary judgment in their favor because the free speech and free association rights under the state constitution are the same as those under the federal constitution and because they did not interfere with union elections and they met and conferred with union representatives.  For the state statutory claim in Count IV, Defendants urge they are entitled to entry of summary judgment in their favor because Plaintiffs admit Defendants complied with the statute.  Defendants also seek summary judgment in favor of the individual Defendants on Plaintiffs' federal claims based on the qualified immunity doctrine.

## Discussion

Summary judgment standard.  Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986) (quotation marks omitted) (quoting Rule 56(c) of the Federal Rules of Civil Procedure).  An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law."  **Hartnagel v. Norman,** 953 F.2d 394, 395 (8th Cir. 1992) (quotation marks omitted) (quoting Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The initial burden is on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **Van Horn v. Best Buy Stores, L.P.,** 526 F.3d 1144, 1146 (8th Cir. 2008) ("the defendants met their initial burden of notifying the . . . court of the basis for their summary judgment motion and identifying the documents that they believed demonstrated the absence of a material fact"). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986). Instead, the non-moving party bears the burden of setting forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial. **Anderson v. Liberty Lobby, Inc**., 477 U.S. 242, 249 (1986); **Palesch v. Missouri Comm'n on Human Rights**, 233 F.3d 560, 565-66 (8th Cir. 2000). All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the non-moving party. See **Ghane v. West,** 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.**, 13 F.3d 264, 269 (8th Cir. 1993). "[I]n order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998). See also **Stanback v. Best Diversified Prods., Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).

Federal claims.  Plaintiffs bring their First Amendment claims under 42 U.S.C. § 1983.  "To survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendant acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right."  **Naucke v. City of Park Hills**, 284 F.3d 923, 927 (8th Cir. 2002).  There is no dispute that the defendants acted under color of state law with respect to Plaintiffs' suspensions and discharges.  The focus then is on whether those suspensions and discharges violated Plaintiffs' First Amendment rights to free speech and free association.

"[T]he First Amendment restrains the government from retaliating against a public employee based on the employee's speech or associations."  **Morris v. City of Chillicothe**, 512 F.3d 1013, 1018 (8th Cir. 2008) (free association claim); see **Wingate v. Gage County Sch. Dist., No. 34**, 528 F.3d 1074, 1080-81 (8th Cir. 2008) (free speech claim); **McGee v. Public Water Supply Dist. # 2**, 471 F.3d 918, 919 (8th Cir. 2006) (free speech claim).  First Amendment employment retaliation claims are analyzed under a three-step burden-shifting test.  **Morris**, 512 F.3d at 1018.

> First, a public employee must show that he [or she] suffered an adverse employment action that was causally connected to his [or her] participation in a protected activity.  Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002).  Once the employee satisfies his [or her] initial burden, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for his or her actions.  Id.  If the employer meets this burden, the burden shifts back to the employee to show that the employer's actions were a pretext for illegal retaliation.  Id.  This third step of showing that a defendant's justification for [the adverse employment action] is unworthy of credence is harder to overcome than the prima facie case because evidence of pretext is viewed in the light of the

employer's justification. <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 834 (8th Cir. 2002).

**Morris**, 512 F.3d at 1018-19.

Here there is no question that Plaintiffs suffered adverse employment actions in that they were suspended and then discharged. <u>See</u> Defs.' Mem. Supp. Mot. Summ. J. at 47-48 (Doc. 53). Therefore, to satisfy their initial burden, Plaintiffs must show that those suspensions and discharges were causally connected to their participation in protected activity.

<u>Protected Activity</u>. The inquiry whether Plaintiffs' conduct has protected status is a question of law for the court, not one of fact for the jury. **Roberts v. Van Buren Pub. Sch.**, 773 F.2d 949, 954 (8th Cir. 1985). The First Amendment's protection of the freedom of association provides public employees with a right to organize a labor union, **International Ass'n of Firefighters, Local No. 3808 v. City of Kansas City**, 220 F.3d 969, 972 (8th Cir. 2000), and to participate in union activities, **Roberts**, 773 F.2d at 957. To trigger First Amendment protection for speech, the "employee must speak as a citizen addressing matters of public concern." **Lindsey v. City of Orrick, Missouri**, 491 F.3d 892, 897 (8th Cir. 2007) (internal quotation marks omitted) (quoting <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 417 (2006)). A public employee's speech is not protected by the First Amendment if it 'owes its existence' to [the employee's] professional responsibilities," **McGee**, 471 F.3d at 921, because "a public employee does not speak as a citizen if [the employee] speaks pursuant to [the employee's] job duties." **Lindsey**, 491 F.3d at 898. <u>Accord</u> **Davenport v. University of Ark. Bd. of**

**Trs.**, 553 F.3d 1110, 1113 (8th Cir. 2009). None of the speech at issue here arose out of Plaintiffs' job responsibilities. Therefore, Plaintiffs may be considered to have been speaking as citizens.

Speech addresses a matter of public concern when it addresses a matter of political, social, or other concern to the community. **Connick v. Myers**, 461 U.S. 138, 146 (1983); **Lindsey**, 491 F.3d at 898. Speech about the use of public funds addresses a matter of public concern, **de Llano v. Berglund**, 282 F.3d 1031, 1037 (8th Cir. 2002); and public safety issues are an "obvious example[] of matters that are of concern to the general public," **McGee**, 471 F.3d at 920. Criticism of government officials and their policies also "clearly addresses matters of public concern," irregardless of how obnoxious or offensive the criticism is. **Lindsey**, 491 F.3d at 898 (internal quotation marks omitted) (quoting Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir. 1993)). "Heightened public interest in a particular issue, while not dispositive, may also indicate that the issue is one of public concern." **Belk v. City of Eldon**, 228 F.3d 872, 878 (8th Cir. 2000). Importantly, the "speech need not be in a public forum to be protected." **Lindsey**, 491 F.3d at 900.

If a public employee speaks out, in public or in private, regarding the employee's own personal interests as an employee, however, that speech is not protected by the First Amendment because it does not address a public concern. **Wingate**, 528 F.3d at 1081. Additionally, speech that "deal[s] with personnel matters" usually does not address a matter of public concern. **Belk**, 228 F.3d at 879. In deciding whether speech addresses a matter

of public concern, the court looks to the "content, form, and context of a given statement, as revealed by the whole record," as well as the manner, time, and place of the employee's speech. **Wingate**, 528 F.3d at 1081.

Here, the complaint contains a general allegation regarding the speech Plaintiffs characterize as protected conduct; specifically, Plaintiffs allege they have spoken out on matters of public concern regarding the District's "fire Department operations, employee morale, working conditions, adequate compensation and benefits, and contract negotiations." (Compl. ¶ 40 [Doc. 1].) More specifically, Plaintiffs urge they spoke out in local media on matters of public concern to the extent that in the spring of 2007 Strinni "submitted an op-ed piece" regarding Ryan's April 2007 election to the Board; and in February 2008 Strinni "gave an extensive interview . . . criticizing [the District]'s hiring practices and certain changes implemented by the Board" and noting that the "new hires were inexperienced and unqualified to perform the tasks assigned to them." (Pls.' Opp'n Defs.' Mot. Summ. J. at 10 [Doc. 59].) To further support their position that they spoke on matters of public concern, Plaintiffs point to Local 1889's involvement in 2008 in a local School Board election when the Local supported a candidate other than the one supported by Hilmer (id. at 10), and to Plaintiffs' allegedly unsuccessful attempt after Ryan's 2007 election to meet with the Board "regarding issues of employee pay, benefits, and qualifications" (id. at 10).

To the extent the above allegedly protected conduct was conduct of the Local not involving Plaintiffs, that conduct does not assist Plaintiffs with respect to their free speech claim because it is not conduct of Plaintiffs. To the extent Plaintiffs rely on non-specific

references to their participation in Local activities, the Court also will not now consider that conduct because the Court cannot ascertain what activity Plaintiffs actually participated in and cannot analyze the activity's content, form, context, manner, time, or place for the free speech claim. Moreover, to the extent the conduct addresses personnel issues, such issues are not matters of public concern except if there is heightened public interest in the issue. Finally, to the extent the speech referenced by Plaintiffs above pertains to public safety issues or consists of criticism of Defendant officials or their policies, the speech may be considered to address public concerns.

With respect to Fleschert, Plaintiffs have not pointed to any evidence of record that she engaged in any of the allegedly relevant conduct, other than Plaintiffs' allegedly unsuccessful effort in August 2007, as Local 1889 officers, to present to the Board proposals regarding employee pay and benefits. (See Pls.' Ex. 3 ¶¶ 48, 49 [Doc. 59-4]; Pls.' Mem. Oppos. Mot. Summ. J. at 10 [Doc. 59].) There is not, however, sufficient information of record to analyze the content, form, context, manner, time, or place of this conduct by Fleschert. Therefore, that conduct will not be further considered by the Court in analyzing whether Fleschert engaged in speech addressing a matter of public concern. The Court will, however, consider that August 2007 activity with respect to Fleshert's free association claim.

There also is evidence that, in August 2007, Fleschert provided a quote for an article titled, "Across-the-board pay hikes unaffordable until pension woes resolved, Hilmer says."[11]

_____

[11] In that article, Fleschert was quoted as stating: "We have, you know, new people that are already leaving and that has to be a concern . . . We're not competitive with our benefits and our

28

(Defs.' Reply Br. at 27 [Doc. 62]; <u>see</u> Pls.' Ex. 3 ¶ 51 [Doc. 59-4].) Therefore, the Court will consider Fleschert's free speech claim as based on her quote in the August 2007 newspaper article.

Defendants point to Fleschert's deposition testimony that she believed she was terminated in violation of her free speech rights because of two conversations she had with Becker, the first when she asked him if his brother was friends with Hilmer and the second occurring in April 2008. (Fleschert Dep. at 246 [Doc. 53-6 at 34]; Defs.' Statem. Facts ¶¶ 139, 142, 143, 144.) These conversations do not address matters of public concern, but rather focus on Becker's brother's affiliations, Fleschert's knowledge that Stonebraker's telephone number was on Becker's cell phone, and Fleschert's opinion that Becker would be taking heat from other District employees due to his brother's relationship with the Board. (Defs.' Statem. Facts ¶¶ 139, 142-44.) Because these conversations did not focus on matters of public concern, that speech was not protected speech.[12]

Under the circumstances, the only speech by Fleschert that may be viewed as addressing a matter of public concern is her quote in the August 2007 newspaper article.

_____

salaries. That's pretty much the bottom line . . . We've got actively probably more than five people actively looking now with applications out . . . ." (Third page of Pls.' Ex. 37 [Doc. 59-37 at 3].)

[12] While Plaintiffs argue a focus on Plaintiffs' conduct toward Becker at this stage of the proceedings is "legally wrong," and recognize that such conduct may support Defendants' position that they would have fired Plaintiffs regardless of protected activity, Pls.' Mem. Oppos. Mot. Summ. J. at 9 [Doc. 59 at 9], the Court finds it appropriate to address whether those conversations constitute protected speech because in her deposition Fleschert testified those conversations were the protected speech that resulted in her discharge. (Fleschert Dep. at 246, Defs' Ex. 6 [Doc. 53-6 at 34].)

With respect to Strinni, as with Fleschert, Plaintiffs point to Plaintiffs' unsuccessful effort in August 2007, as Local 1889 officers, to present to the Board proposals regarding employee pay and benefits. (See Pls.' Ex. 4 ¶¶ 46-47 [Doc. 59-5]; Pls.' Mem. Oppos. Mot. Summ. J. at 10 [Doc. 59].) In his declaration, Strinni also refers to various activities for the Local that he engaged in, for instance, "assist[ing] Local 1889 and its members in pursuing various lawsuits against" the District (Pls.' Ex. 4 ¶ 39 [Doc. 59-5]) and attempting to schedule workshops with Chief Silvernail and Hilmer (Pls.' Ex. 4 at ¶ 30 [Doc. 59-5] and Pls.' Exs. 38 and 39 [Docs. 59-38 and 59-39].) While this conduct may support Strinni's free association claim, there is not sufficient information of record to analyze the content, form, context, manner, time, or place of this conduct as free speech conduct. Therefore, that conduct will not be further considered by the Court in analyzing whether Strinni engaged in speech addressing a matter of public concern.

The specific conduct of Strinni identified by Plaintiffs that must be analyzed to ascertain whether or not it addresses a matter of public concern is the op-ed piece Strinni submitted to the local newspaper after Ryan's April 2007 election to the Board, and the interview Strinni provided to a local media in February 2008 criticizing the District's hiring practices and certain changes implemented by the Board, which he contended had resulted in, among other things, the loss of qualified long-term employees to other fire protection districts and a reduction in the quality of replacement applicants. (Pls.' Mem. Oppos. Mot. Summ. J. at 10 [Doc. 59]; Pls.' Statem. Facts ¶¶ 12, 13, 14 [Doc. 59-2 at 80]; see also Pls.' Exs. 40 and 41 [Docs. 59-40 and Doc. 59-41].) In his declaration, Strinni also refers to the

August 29, 2007 newspaper article in which he responded to Hilmer's explanation of the District's pension policy,[13] and another local newspaper article published in March 2008 regarding changes in the pension plan that were proposed by District employee Tim White, who no longer was a member of Local 1889, in which Strinni is quoted as saying Hilmer was acting to "bust" the Local.[14]  (Pls.' Ex. 4 ¶¶ 49, 51 [Doc. 59-4]; see Pls.' Ex. 46 [Doc. 59-46].)

These statements by Strinni in the local media may be viewed as addressing matters of public concern to the extent the statements focus on criticism of public officials or their policies, or public safety issues in terms of the number and qualifications of District employees.

Defendants argue Plaintiffs' statements in the media are not protected speech because the quotations represent mere dissatisfaction with management or concerns about internal practices pertinent only to fellow employees, which do not constitute speech addressing a public concern, citing **de Llano**, 282 F.3d at 1036-37 (affirming the grant of summary judgment in favor of the defendants on free speech employment retaliation claim) and **Tuttle**

---

[13]  That article, titled "Across-the-board pay hikes unaffordable until pension woes resolved, Hilmer says," quotes Strinni, in relevant part, as suggesting alternatives to the disability plan the Board was considering both during a workshop the Local and Board had and during a meeting the Local's representatives had with a representative of the Hoffman Group, Inc. to discuss disability benefits.  (Pls.' Ex. 37 [Doc. 59-37].)  In particular, Strinni was quoted as stating, "[The Hoffman Group, Inc. representative] told us the whole policy was $40,000, so I can't imagine these benefit changes being that big of an increase to the whole policy . . . " (Id.)

[14]  Specifically, Strinni is quoted in that article as saying, "This is Aaron Hilmer's way of busting this union," after Hilmer was quoted as saying Tim White's presentation was "a breath of fresh air -- the first sensible remarks the board has heard in three years from the rank and file."  (Pls.' Ex. 46 [Doc. 59-46].)

**v. Missouri Dep't of Agric.**, 172 F.3d 1025, 1034 (8th Cir. 1999) (affirming the grant of judgment as a matter of law in favor of defendants on a free speech employment retaliation claim). In **de Llano**, the United States Court of Appeals for the Eighth Circuit concluded portions of the plaintiff's letters to the local media "related specifically to the ongoing feuds he was having with the defendants," amounted to "public[] complaining about private disputes that were unique to him," and, to that extent, did not address a matter of public concern but rather addressed personnel matters that are not generally protected by the First Amendment.[15] **de Llano**, 282 F.3d at 1036-37. In **Tuttle**, the Eighth Circuit concluded that plaintiff's statements regarding the possibility and effect of cutting back, salary increases, promotions, another employee's color-blindness as not affecting that employee's ability to perform his job, and safety issues, did not constitute protected activity in that the plaintiff was not speaking as a concerned citizen on matters of public concern but as an employee on matters only of personal interest. **Tuttle**, 172 F.3d at 1034. Because the plaintiff had only spoken about internal practices pertinent to fellow employees, the plaintiff had not engaged in protected speech even though some of the plaintiff's comments addressed another employee's color-blindness. **Id.**

While a number of Plaintiffs' relevant comments in the media appear to be complaints about personnel matters, they were responses to or part of local media coverage of Board

---

[15]   The Eighth Circuit also concluded some of the plaintiff's statements were "properly characterized as issues of public concern" but those comments were  not a substantial factor in the plaintiff's discharge. **de Llano**, 282 F.3d at 1037.

activities in the District regarding salaries, benefits, and other issues pertaining to District personnel. Due to the local media coverage of these issues, the public was interested in these matters and, under the circumstances of this case, the Court concludes they may be considered as comments addressing matters of public concern.

Having found certain of Plaintiffs' comments in the media were protected, the Court usually proceeds to consider the *Pickering* balancing test, which arises out of **Pickering v. Board of Educ.**, 391 U.S. 563 (1968), and balances "the public employee's interest in speaking against his [or her] employer's interest in promoting the efficiency of the public service it performs through its employees." **Lindsey**, 491 F.3d at 900. "As a threshold matter, however, [the court] must ask whether [Defendants] ha[ve] produced evidence to indicate the speech had an adverse impact on the efficiency of the [public employer]'s operations." **Id.** Without such a showing, "'there [is] no government interest[] in efficiency to weigh against [the employees'] First Amendment interests,'" and the Court does not engage in the *Pickering* balancing test. **Id.** (quoting Belk, 228 F.3d at 881); see also **Gordon v. City of Kansas City, Mo.**, 241 F.3d 997, 1003 (8th Cir. 2001) (the court does not proceed to the balancing stage "if the government employer cannot produce some evidence showing that the employee's speech *disrupted* the workplace"). "[T]o trigger the *Pickering* balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff[s'] performance or impaired working relationships. Mere allegations the speech disrupted the workplace or affected morale, without evidentiary

support, are insufficient." **Lindsey**, 491 F.3d at 900 (citations omitted).

Notably, in resolving this threshold matter, the Court is limited to inquiring whether the protected speech was disruptive. **Id.** at 901. Therefore, the Court cannot now consider whether Plaintiffs' speech regarding Becker was disruptive, because that speech is not protected by the First Amendment. Defendants have not produced any evidence indicating that any of Plaintiff's protected comments in the media caused any adverse impact on the efficiency of the District's operations. In fact, Defendants state they "do not contend that Plaintiffs' protected activity . . . caused a disruption in the District." (Defs.' Reply Br. at 29 n.8 [Doc. 62].) Therefore, the Court will not engage in the *Pickering* balancing test, and Plaintiffs' pertinent comments to the media may be considered protected speech under the circumstances of this case. To the extent the *Pickering* test should be applied with respect to Plaintiffs' activities for the Local for their free association claim, the Court concludes it is inapplicable because Defendants do not contend such conduct was disruptive. **Cf. International Ass'n of Firefighters, Local No. 3808**, 220 F.3d at 974 n.3; **Roberts**, 773 F.2d at 957.

Substantial or Motivating Factor. To show protected activity was causally related to their suspensions and discharges, Plaintiffs must show the protected activity was a substantial or motivating factor in Defendants' decision to suspend and discharge them.[16]

_____

[16] Defendants urge it is not enough to establish the protected speech or conduct was a substantial or motivating factor for the adverse employment action,"citing **Osborne v. Grussing**, 477 F.3d 1002, 1006 (8th Cir. 2007). That case did not involve a First Amendment employment retaliation claim, but arose out of a regulatory enforcement situation, "with retaliation claims by

34

See, e.g., **de Llano**, 282 F3d 1031. "Whether the protected conduct was a substantial or motivating factor in an employment decision is a question of fact, but the sufficiency of the evidence to create an issue of fact for the jury is solely a question of law." **Morris**, 512 F.3d at 1018; accord **Naucke**, 284 F.3d at 928 ("while causation is generally a jury question, it can provide the basis for summary judgment when 'the question is so free from doubt as to justify taking it from the jury'" (quoting Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir. 1994)). If "[i]t can be inferred from the evidence that [the employer] sought to punish [the employee] because of [the employee's protected activity], then there exists a genuine issue of material fact as to whether [the employee's] speech was a substantial or motivating factor in [the] termination." **Graves v. Arkansas Dep't of Fin. and Admin.**, 229 F.3d 721, 723 (8th Cir. 2000) (per curiam).

Plaintiffs urge Plaintiffs' union activities and speech were the reason for the discipline they received. (Pls.' Opp'n Defs.' Mot. Summ. J. at 23 [Doc. 59].) First, they point to evidence that Plaintiffs were long-term employees with no disciplinary actions prior to their suspensions and that the Board had what Plaintiffs characterize as "anti-union tendencies."[17]

---

citizens seeking to avoid the consequences of their illegal actions" and expressly acknowledges the "case d[id] not involve a public employee seeking to reverse an adverse employment action." **Id.** As noted in the text of this memorandum, Eighth Circuit authority supports application of the substantial or motivating factor causation element in First Amendment employment retaliation cases, and that is the test this Court will use.

[17] In support of their assertion that "[t]he anti-Union tendencies of Hilmer, Stegman, and Ryan are well-documented," Plaintiffs cite to paragraphs 15 through 26 of their Statement of Facts (Pls.' Opp'n Defs.' Mot. Summ. J. at 23 [Doc. 59].) Paragraphs 15 through 17 refer to Hilmer's quotes in the April 18, 2007 newspaper article. Paragraph 18 refers to Hilmer's quote in the August

(Pls.' Opp'n Defs.' Mot. Summ. J. at 23 [Doc. 59].) While it may be appropriate to discipline Plaintiffs based on their admitted conduct, Hilmer's quotes in the media present a genuine issue of material fact regarding the substantial or motivating factor for the discipline Plaintiffs received.

Plaintiffs also contend the District "conducted a sham investigation into Becker's claims, with the foregone conclusion that [Plaintiffs] would be terminated." (Pls.' Opp'n Defs.' Mot. Summ. J. at 24 [Doc. 59].) This contention is based on (a) the early April 2008 discussion of Becker's experiences by non-Board Member supervisory employees of the District which resulted in no action being taken and Hilmer's first response to the news of Becker's experiences, which was to suggest Becker contact his immediate supervisor (see Pls.' Resp. to Defs.' Statem. Mat. Facts ¶¶ 154, 156) [Doc. 59-2]; see Pls.' Ex. 24 [Doc. 59-24]); (b) the investigator's perspective that people who were in the union and held positions in the union were primarily responsible for the intimidation and harassment (id. ¶ 179; Pls.' Statem. Facts ¶ 35 [Doc. 59-2]); (c) the Board advising the investigator who to interview and the investigator conferring "with Hilmer and [the Board]'s attorney about the questions he

8, 2007 newspaper article. Paragraph 19 refers to quotes from an interview Hilmer provided to the local newspaper on December 5, 2007. Paragraph 20 refers to the comment Hilmer made to the local newspaper on March 12, 2008 that the proposal by White was "a breath of fresh air - the first sensible remarks the board has heard in three years from the rank and file." Paragraphs 21-26 refer to Stonebraker and comments he published on the South County Truth Spot. Nothing of record indicates how Stonebraker's statements in paragraphs 21-26 of Plaintiffs' Statement of Facts may be attributed to any Defendant.

would ask"[18] (Pls.' Resp. to Defs.' Statem. Mat. Facts ¶ 180 [Doc. 59-2]); and (d) the absence of a report to the Board by the investigator and the Board's alleged failure to spend "substantial time discussing Becker's allegations or the plaintiffs' employment" (id. at 181, 206).

The fact the Board and third party investigator conferred about whom the investigator should interview or about the investigator's questions, and the fact that the third party

---

[18] The evidence on which Plaintiffs rely to suggest the investigator conferred with Hilmer and the Board's attorney about the questions to be asked, was the following deposition testimony of Moore:

| Answer: | . . . [T]here was a set [of] three or four questions that everybody got and then there were some that were specific to [an] individual |
| --- | --- |
| Question: | And who wrote the questions? . . . |
| Answer: | I did [after conversations with Hilmer and the District's attorney.] |

\*   \*   \*

| Question: | . . . [D]id . . . anyone . . . make any suggestions to change the questions that you wanted to ask? |
| --- | --- |
| Answer: | No. |
| Question: | Did anyone make any suggestions about additional questions that you should ask? |
| Answer: | No. |
| Question: | Did you use these questions throughout all of the interviews that you conducted? |
| Answer: | Yes. |

(Moore Dep. 27-28 [Doc. 59-25].)

investigator failed to submit a report to the Board, do not raise concerns about the investigation or whether the Plaintiffs' protected conduct was a substantial or motivating factor in their discipline. Pre-investigation conversations are necessary to limit the investigation, and recordings of the investigator's interviews were provided to and reviewed by the Board members, who were the individuals making the disciplinary decisions. There is no indication how the investigator's personal opinion about who was responsible for the harassment would affect the Board's disciplinary decisions, especially because the Board did not receive a report from the investigator and reviewed the recordings of the investigator's interviews. Finally, the length of time the Board discussed Becker's and Plaintiffs' situation is not dispositive because Plaintiffs admitted the conduct that was the basis of the discipline and the Board members reviewed the recordings of the third party investigator's interviews prior to Plaintiffs' discharge. The report, from Waser's notes and testimony, that supervisory employees discussed Becker's situation and found no violation of the District's anti-harassment policy before the Board engaged in the investigation and discipline of Plaintiffs based on violations of the anti-harassment policy presents a genuine issue of material fact regarding the actual basis for Plaintiffs' discipline.

Plaintiffs further urge they were treated differently than other employees who allegedly harassed and intimidated co-workers, specifically, Chief Silvernail; Chris Francis, who had asked Becker about his brother; and an employee who was "in prison awaiting trial on murder-for-hire charges [who was able to use] his sick and annual leave while in jail and

suspended from performing his job duties." (Pls.' Br. at 24-25.) While not agreeing with Plaintiffs' argument, Defendants do not dispute these circumstances. Although it is not clear how similar these employees' situations were to Plaintiffs' situation, different treatment of these individuals viewed in the light most favorable to Plaintiffs is sufficient to raise a genuine issue of material fact.

Finally, Plaintiffs urge the temporal proximity between their protected conduct, in 2007 and early 2008, and their suspensions and discharges in April to June 2008, establish that their protected activity was a motivating factor in that discipline. "[T]emporal proximity between protected activity and an adverse employment action can contribute to establishing the [substantial or motivating factor] element of a prima facie case of retaliation." **Davison v. City of Minneapolis, Minn.**, 490 F.3d 648, 657 (8th Cir. 2007).

For Fleschert, the relevant protected activity is her presentation to the Board in August 2007 and her commentary reported by the newspaper in August 2007, more than seven months before her suspension with pay.[19] Without more, that protected conduct is not close enough to her suspension and discipline to warrant a determination or raise a question that the protected conduct was a motivating factor in her discipline.

For Strinni, the relevant protected activity included commentary reported in the media occurring within two months before his suspension with pay. This two month time period

_____

[19] Plaintiffs rely on the Union's support of a school board candidate other than one supported by Hilmer in April 2008 as the protected activity this Court should consider. As noted earlier, however, nothing of record indicates the extent to which either Plaintiff engaged in that activity and the Court is not considering that as protected activity for either Plaintiff.

may be short enough to raise an issue whether this protected commentary, along with his prior union activities, may have been a factor in the decision to discipline him. See **Stever v. Independent Sch. Dist. No. 625, St. Paul**, 943 F.2d 845, 852 (8th Cir. 1991) (the court concluded the timing of the transfer "raises an inference of retaliatory motive" when plaintiff sent memoranda about student safety in April and May and was transferred involuntarily in July 1985).

Viewing the evidence in a light most favorable to Plaintiffs, there are genuine issues of material fact sufficient to avoid the entry of summary judgment in favor of Defendants on the substantial or motivating factor aspect of Plaintiffs' First Amendment claims.

Legitimate, Nondiscriminatory Reason for Discipline.    Even assuming both Plaintiffs established their *prima facie* burden, Defendants then have the burden to demonstrate they would have taken the adverse employment action regardless of Plaintiffs' protected activity. **Morris**, 512 F.3d at 1019; **Davison**, 490 F.3d at 658.

Here, Plaintiffs do not dispute that Strinni's unauthorized review of Becker's cell phone resulting in the discovery of Stonebraker's telephone number on it and Strinni's subsequent disclosure of this information to others occurred. Plaintiffs do not dispute that Strinni told Becker about a strike that was not actually planned. Plaintiffs also do not contest Fleschert's relevant conversations with Becker. The Board learned of Becker's experiences with Strinni and Fleschert; authorized an investigation by a third party, which was conducted; reviewed the recordings of the interviews conducted by the investigator; and then

discharged Plaintiffs, after having suspended Plaintiffs while the matter was investigated. The reported reason for Defendants' discharge was Plaintiffs' violation of the District's anti-harassment policy. Defendants have demonstrated that, even without any protected activity by Plaintiffs, the same decisions regarding Plaintiffs' discipline would have been made.

Pre-text. Defendants having shown a legitimate, nondiscriminatory basis for the discipline of Plaintiffs, Plaintiffs now have the burden to show Defendants' reasons for Plaintiffs' suspensions and terminations were pretextual. **Morris**, 512 F.3d at 1019. "Meeting th[is] burden . . . is more difficult for a plaintiff than at the prima facie stage because, here, evidence of pretext and discrimination are viewed in the light of the employer's justification." **Id.**

"Pretext may be shown with evidence that an employer has proffered an explanation with no basis in fact, with evidence that the plaintiffs recently received favorable reviews, or with evidence that the employer's proffered reason for its employment decision changed substantially over time." **Id.** Here, Defendants' nondiscriminatory explanation for Plaintiffs' suspensions and discharges have a factual basis in the record and has been consistently proffered by Defendants as the reason for those suspensions and terminations. Moreover, there is no indication of record that Plaintiffs had received favorable reviews just prior to their discipline, although there also is no evidence of record that anyone complained about their job performance.

In support of their position that a question of fact exists regarding this aspect of the

case, Plaintiffs point to evidence that this Board had not suspended or terminated anyone for violations of the anti-harassment policy; at the time of Plaintiffs' discipline the Chief's contract was renewed with the Board's knowledge that he had a conviction for harassment; and an employee charged with murder-for-hire was not terminated or otherwise disciplined. (Defs.' Statem. Facts ¶ 241 [Doc. 53]).  While Defendants do not dispute the existence of these circumstances, they dispute their significance in showing pretext.  The Court finds, viewing the evidence most favorably to Plaintiffs, that such circumstances are sufficient to raise a genuine issue of material fact regarding the actual reason for the discipline Plaintiffs received.

Plaintiffs also point out that Defendnts did not follow the District's Progressive Discipline Policy in disciplining Plaintiffs.  (Pls.' Opp'n Defs.' Mot. Summ. J. at 29 [Doc. 59].)  Specifically, Plaintiffs point out the Progressive Discipline Policy contains provisions stating that the Chief must recommend to the Board any suspension without pay, demotion, or dismissal; their suspension and termination notices did not contain the detailed information required by the pertinent provisions of the EMoPP; and they were not permitted to pursue grievances for  their discipline.  (Pls.' Resp. Defs.' Statem. Facts ¶¶ 48, 171, 200, 223, 224 [Doc. 59-2]; Defs.' Ex. 11 [Doc. 53-11].)   Defendants did not respond to this pretext argument.

Departures from disciplinary procedures may be evidence of pretext, while "caveats in an employee policy [may] negate its persuasiveness in showing pretext."  **Morris**, 512

F.3d at 1020 (statements in employee manuals and related documents that an employer is not bound by any number of warnings and that "it can fire at-will employees without warning if necessary" negated any persuasiveness in showing pretext through a failure to follow a disciplinary procedure).

It is undisputed that the Board, imposed the suspensions and terminations of Plaintiffs without a recommendation from Silvernail; that Plaintiffs had not previously been disciplined; that the suspension and termination notices that Plaintiffs received did not include the detailed information required by the EMoPP; and that Plaintiffs were not permitted to grieve their discipline. While the EMoPP provides that "[t]he District may bypass certain phase(s) of the [disciplinary] policy as warranted by the nature and severity of the offense," EMoPP at 38 (Defs.' Ex. 11 at 38 [Doc. 53-11]), and that, if an investigation "confirms that a violation of th[e anti-harassment] policy has occurred, appropriate corrective action will be taken, including discipline, up to and including immediate termination of employment," (id. at 47) the Court concludes, upon reviewing the record most favorably to Plaintiffs, that Defendants' failure to follow the Progressive Discipline Policy demonstrates the existence of a genuine issue of material fact as to whether or not the reasons for the Board's discipline of Plaintiffs was pretextual .

Defendants' motion for summary judgment on Plaintiffs' federal claims is denied.

State Claims. Defendants also move for summary judgment on the state constitutional

claims in Count III and the state statutory claims in Count IV.  In Count III, Plaintiffs allege

they are entitled to relief for Defendants' alleged violations of Plaintiffs' rights to free speech

and free association under Sections 8 and 9 of Article I of the Missouri Constitution[20] and

to bargain collectively through representatives of their own choosing under Section 29 of

Article I of the Missouri Constitution.[21]  (Compl. at 15-19 [Doc. 1].)  In Count IV, Plaintiffs

allege they are entitled to relief under Missouri Revised Statutes § 105.510.[22]

While in their motion for summary judgment Defendants did not expressly argue they

are entitled to summary judgment on the state constitutional freedom of speech and freedom

of association claims (Defs.' Mem. Supp. Mot. Summ. J. at 73-75 [Doc. 53]), Defendants

urge in their reply brief that they are entitled to summary judgment on those claims for the

---

[20]  Section 8 of Article I of the Missouri Constitution states, in relevant part, "that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty."  Section 9 of Article I of the Missouri Constitution states, in relevant part, "[t]hat the people have the right peaceably to assemble for their common good."

[21]  Article 1, Section 29 of the Missouri Constitution provides "[t]hat employees shall have the right to organize and to bargain collectively through representatives of their own choosing."

[22]  Section 105.510 of the Missouri Revised Statutes provides, in relevant part, that

   [e]mployees, except police, deputy sheriffs, Missouri state highway patrolmen, Missouri national guard, all teachers of all Missouri schools, colleges and universities, of any public body shall have the right to form and join labor organizations and to present proposals to any public body relative to salaries and other conditions of employment through the representative of their own choosing.  No such employee shall be discharged or discriminated against because of his exercise of such right, nor shall any person or group of persons, directly or indirectly, by intimidation or coercion, compel or attempt to compel any such employee to join or refrain from joining a labor organization, except that the above excepted employees have the right to form benevolent, social, or fraternal associations.

same reasons they are entitled to summary judgment on the First Amendment free speech and free association claims because the federal constitutional and state constitutional free speech and free association protections are the same (Defs.' Reply Br. at 37 and 37 n.10 [Doc. 62]). Plaintiffs acknowledge that Missouri courts have found the federal and state constitutional rights to free speech and free association are similar, but argue the state courts have not concluded those state and federal rights are the same. (Pls.' Opp'n Defs.' Mot. Summ. J. at 30 n. 18 [Doc. 59 at 36].) The parties have not directed the Court to any Missouri state court decisions delineating the extent to which, if at all, the state and federal constitutional free speech and free association claims differ. See **State v. Roberts**, 779 S.W.2d 576, 579 (Mo. banc 1989) (noting the court did not need to decide "whether the circumference of Mo. Const. art. I, § 8 is identical to that of the First Amendment in all instances"); accord **BBC Fireworks, Inc. v. State Highway and Transp.**, 828 S.W.2d 879, 881 (Mo. banc 1992) (noting the court did not need to reach the issue). For purposes of the summary judgment motion, this Court will assume, without deciding, that the state constitutional freedoms are equal to the federally protected freedoms of speech and association. See **Boemler Chevrolet Co. v. Combs**, 808 S.W.2d 875, 880 (Mo. Ct. App.1991) ("Clearly, the First Amendment protects freedom of speech. In Missouri, this right is recognized by our state constitution. Mo. Const. Art. 1, Section 8" (citations omitted)).

Due to the assumed similarity in the state constitutional and federal constitutional free speech and free association protections, Defendants' motion for summary judgment on the

state constitutional free speech and free association claims is denied for the same reasons that Defendants' motion for summary judgment on Plaintiffs' First Amendment free speech and free association claims was denied.

With respect to the state constitutional claim under Article 1, Section 29 of the Missouri Constitution, it is clear that this provision applies to public employees. **Independence-Nat'l Educ. Ass'n v. Independence Sch. Dist.,** 223 S.W.3d 131 (Mo. banc 2007). This provision protects an employee from any coercive conduct by the employer, including threats of discharge or changes in compensation, hours of work and other working conditions, which denies the employee the right to organize and choose collective bargaining representatives. **Quinn v. Buchanan**, 298 S.W.2d 413, 417, 418 (Mo. banc 1957); accord **Smith v. Arthur C. Baue Funeral Home**, 370 S.W.2d 249, 254 (Mo. 1963) (this provision protects an employee from "discharge . . . for asserting the constitutional right . . . to choose collective bargaining representatives to bargain for him concerning his employment"). This state constitutional provision does not, however, require "public employers to reach agreements with their employee associations." **Independence-Nat'l Educ. Ass'n**, 223 S.W.3d at 139. More specifically, the Missouri Supreme Court stated that "[t]o allow employees to bargain collectively does not require the employer to agree to any terms with the represented groups. The employer is free to reject any and all proposals made by the employees." **Id.** at 137.

While the parties disagree on the manner in which a claim under this state

constitutional provision may be established,[23] the Missouri Supreme Court referred to wrongful discharge cases when it noted that an individual's damages cause of action for violation of the provision "could only be determined in an action brought by [the individual] for that purpose." **Quinn**, 298 S.W.2d at 418. Therefore, the Court will consider the requirements of a wrongful discharge claim as the requirements for a claim under Article 1, Section 29 of the Missouri Constitution.

In general, Missouri employees without a contract, such as Plaintiffs, are at-will employees who may be discharged at any time, "with or without cause, and the employer will not be liable for wrongful discharge." **Dunn v. Enterprise Rent-A-Car Co.**, 170 S.W.3d 1, 6 (Mo. Ct. App. 2005). There are, however, public policy exceptions to this rule, including that an employee may have a wrongful discharge claim when the discharge violates

---

[23] Defendants argue that for this claim Plaintiffs must show either that they refused to allow Plaintiffs to choose their collective bargaining representatives or refused to engage in collective bargaining discussions, citing **Moore v. Derby Ref. Co.**, 1987 U.S. Dist. LEXIS 15358 (W.D. Mo. Nov. 5, 1987) (No. 86-6140-CV-SJ-6). The **Moore** case, however, found the plaintiff had not stated a claim for wrongful discharge either as a contract employee or under the public policy exception to the employment at-will doctrine, and did not have the opportunity to address how a plaintiff establishes a violation of Section 29 of Article I of the Missouri constitution. **Id.** at *4-13. Additionally, the circumstances in **Moore** were not in any manner focused on choosing collective bargaining representatives, a right to organize, or an effort to bargain collectively. **Id.** Therefore, the Court does not find **Moore** applicable in deciding how to establish a claim under Section 29 of Article I of the Missouri constitution.

Defendants also cite to **Independence-Nat'l Educ. Ass'n**, 223 S.W.3d at 135, to support their position that, to establish this state constitutional claim, Plaintiffs must show either that the employer refused to allow plaintiff to choose his or her collective bargaining representatives or the employer refused to engage in the collective bargaining process. The Missouri Supreme Court in that case did not, however, have before the question of how a plaintiff establishes a claim under the constitutional provision. See **id.**

a clear mandate of public policy, such as when the discharge follows the employee's assertion of a right to designate collective bargaining representatives or join a labor union. **Boyle v. Vista Eyewear, Inc.**, 700 S.W.2d 859, 875 and 875 n. 10 (Mo. Ct. App. 1985) (citing <u>Smith</u>, 370 S.W.2d at 254 as applying an exception to the at-will doctrine in determining that "an employer is liable . . . for wrongful discharge where it fires the employee for exercising his constitutional right to choose bargaining representatives to bargain for him with his employer").

In a wrongful discharge case based on the public policy exception to the at-will employment doctrine, after a *prima facie* case is made and once the "employer produces evidence of a legitimate reason for the employee's discharge, the plaintiff [may] be able to persuade the jury that the employer's reason is pretextual." **Kummer v. Royal Gate Dodge, Inc.**, 983 S.W.2d 568, 572 (Mo. Ct. App.1998) (addressing a wrongful discharge claim of retaliation for filing a worker's compensation claim) (internal quotation marks omitted) (quoting <u>Wiedower v. ACF Indus., Inc.</u>, 715 S.W.2d 303, 307 (Mo. Ct. App. 1986)). Importantly, where the record "contains competent evidence of two possible but contradictory reasons for plaintiff's discharge" the question is one for the jury. **Wey v. Dyno Nobel, Inc.**, 81 S.W.3d 208, 211 (Mo. Ct. App. 2002) (addressing a wrongful discharge claim of retaliation for exercising worker's compensation rights).

Here, it is not clear that Plaintiffs can establish they were discharged for a violation of the terms of this state constitutional provision. The undisputed record indicates that the

Local existed to represent employees at the District and that Plaintiffs were officers of the Local. Moreover, the undisputed record shows that at least Plaintiff Strinni presented Local proposals to the Board on several occasions, and Plaintiff Fleschert may have assisted with one such presentation. There may or may not be evidence that the Board's conduct interfered with Plaintiffs' representation of the Local prior to their suspension or discharge. For purposes of this summary judgment motion, however, the Court will assume Plaintiffs can establish their *prima facie* case. The undisputed record establishes that Defendants have evidence that of a legitimate reason for Plaintiffs' suspensions and discharge, their treatment of Becker. Finally, as noted earlier in the discussion of pretext with respect to Plaintiffs' First Amendment claims, there exists genuine issues of fact whether Plaintiffs were discharged for the pertinent conduct regarding Becker or for their activities on behalf of the Local. Therefore, Defendants' motion for summary judgment on the claim under Section 29 of Article I of the Missouri Constitution is denied. See also **Hughes v. Freeman Health Sys.**, 283 S.W.3d 797, 801 (Mo. Ct. App. 2007) (wrongful discharge claim based on public policy exception to at-will doctrine; concluding summary judgment was not proper because "two plausible, but contradictory, accounts of" the reason for the discharge existed and "resolution of the matter will require the drawing of inferences from disputed facts").

With respect to Plaintiffs' statutory claim under Missouri Revised Statutes § 105.510, Missouri courts have characterized that provision and its related provisions, Mo. Rev. Stat. § 105.500 *et seq.*, referred to as the Public Sector Labor Law, as "merely . . . a procedural

vehicle for assertion by [public employees] of their constitutional rights to peaceably assemble and to petition for redress of grievances." **Nichols v. City of Kirksville**, 68 F.3d 245, 248 (8th Cir. 1995) (alteration in original) (internal quotation marks omitted) (quoting Curators of the Univ. of Missouri v. Public Serv. Employees LocalNo. 45, 520 S.W.2d 54, 58 (Mo. banc 1975)). More recently, the Missouri Supreme Court stated, in relevant part, that "the public sector labor law is read to provide procedures for the exercise of th[e] right [to bargain collectively] for those occupations included." **Independence-Nat'l Educ. Ass'n**, 223 S.W.3d at 136. Therefore, under the Public Sector Labor Law, an employer's obligation is to meet and confer with the collective bargaining representatives. **Id.**

> There is nothing in the [Public Sector Labor Law], as it has developed, that requires a public entity to agree to a proposal by its employee unions or organizations. In fact, this Court has repeatedly recognized that the public sector labor law allows employers to reject all employee proposals, as long as the employer has met and conferred with employee representatives.

**Id.**; accord **State ex rel. Missey v. City of Cabool**, 441 S.W.2d 35, 41 (Mo. 1969) ("The [Public Sector Labor Law] provides only a procedure for communication between the organization selected by public employees and their employer without requiring adoption of any agreement reached").

Here there is no dispute that Plaintiff Strinni presented the Board with the Local's proposals. The record is not clear, however, that the presentations complied with any "meet and confer" requirements provided under Missouri law; and the parties have not provided this Court with guidance or argument on any such requirements. Additionally, to the extent

the statute provides a method for employees to pursue their constitutional rights,[24] this Court has found genuine issues of material fact exist with respect to whether or not Defendants disciplined one or both Plaintiffs for their efforts on behalf of the Local, rather than for their relevant conduct directed toward Becker. Accordingly, Defendants' motion for summary judgment on the state statutory claim is denied.

Qualified Immunity of Individual Defendants. Finally, Defendants urge the Board Members and Chief are entitled to summary judgment on the federal claims against them on the basis of qualified immunity. (Defs.' Mot. Summ. J. at 76-79 [Doc. 53 at 87-90].)

The qualified immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982). In addressing qualified immunity issues, the Court considers, in any order, whether the facts alleged or shown by the plaintiff make out a violation of a federal constitutional right and whether the constitutional right at issue was clearly established at the time of the defendant's alleged misconduct. **Pearson v. Callahan**, 129 S.Ct. 808 (2009).

Notably, qualified immunity is only available to government employees sued in their individual capacity. **Bankhead v. Knickrehm**, 360 F.3d 839, 844 (8th Cir. 2004)

---

[24] The parties discuss the state constitutional and state statutory claims together in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 30-31 (Doc. 59 at 36-37) and in Defendants' Reply Brief at 37-39 (Doc. 62 at 37-39).

("[q]ualified immunity is a defense only against a claim in one's individual capacity"); **Johnson v. Outboard Marine Corp.**, 172 F.3d 531, 535 (8th Cir. 1999). Therefore, this defense does not apply to Plaintiffs' federal claims against the individual Defendants sued in their official capacities, and will only be addressed to the extent Plaintiffs' federal claims are pursued against the individual Defendants sued in their individual capacities.

When the undisputed record establishes that a defendant who is sued in his individual capacity under § 1983 was not personally or directly involved in the alleged constitutional violation, then that defendant is entitled to the entry of summary judgment in his favor on the basis of the qualified immunity doctrine. **Walden v. Carmack**, 156 F.3d 861, 871 (8th Cir. 1998) (sheriff entitled to qualified immunity from § 1983 claim where he did not participate in any misrepresentation of information to the judge issuing a search warrant when issuance of the search warrant was the basis of the claim); **Ripson v. Alles**, 21 F.3d 805, 808-09 (8th Cir. 1994) (concluding a defendant who was not personally or directly involved in the alleged constitutional violation was entitled to summary judgment on the grounds of the qualified immunity doctrine).

With respect to Chief Silvernail, the undisputed record discloses that he was not directly or personally involved in any alleged violation of Plaintiffs' First Amendment rights, because he was not a participant in the Board's decisions to discipline Plaintiffs or in the Board's investigation of Plaintiffs' conduct that resulted in that discipline. The fact that Chief Silvernail may have conveyed information to the Board, which then engaged in the

investigation and discipline of Plaintiffs, is not enough to support a determination that Chief Silvernail participated in the Board's allegedly unconstitutional disciplinary conduct. Therefore, Chief Silvernail, in his individual capacity, is entitled to qualified immunity as he was not personally involved in the allegedly unconstitutional conduct that is the basis of Plaintiffs' First Amendment claims. The motion for summary judgment will be granted in part to enter judgment in favor of Defendant Silvernail on Plaintiffs' federal law claims to the extent they are pursued against Defendant Silvernail in his individual capacity.

With respect to the individual Board Member Defendants, the Court will deny the summary judgment motion on qualified immunity grounds. Defendants urge these Defendants did not violate Plaintiffs' constitutional rights because Plaintiffs' speech and association were not protected under the First Amendment. (Defs.' Mem. Supp. Mot. Summ. J. at 78 [Doc. 53 at 89].) Additionally, the Board Member Defendants urge they are entitled to qualified immunity because they based the discipline of Plaintiffs on Plaintiffs' violation of District policy,[25] rather than on any conduct or speech by Plaintiffs that is protected by the First Amendment.

As found by the Court in its earlier discussion of Plaintiffs' First Amendment claims, however, the available record demonstrates the existence of genuine issues of material facts regarding whether the discipline of Plaintiffs was based on their violation of the District's

---

[25] In particular, Defendants state "the uncontroverted evidence shows that [the Board Member Defendants] did not consider Plaintiffs' union membership or speech when they voted to suspend and terminate [Plaintiffs'] employment." (Defs.' Mem. Supp. Mot. Summ. J. at 78 [Doc. 53-89].)

anti-harassment policy or on any of their protected activity and whether or not at least some of Plaintiffs' speech and activities on behalf of the Local were protected by the First Amendment. Therefore, genuine issues of fact exist to preclude a finding that Board Member Defendants are entitled to qualified immunity to the extent Plaintiffs' First Amendment rights are pursued against these Defendants in their individual capacities. Defendants' motion for summary judgment is denied to the extent it is based on the individual Board Members' qualified immunity.

### Conclusion

The Court having granted in part and denied in part Defendants' motion for summary judgment, the claims remaining for trial are Plaintiffs' First Amendment claims (Counts I and II) against Chief Silvernail in his official capacity only; Plaintiffs' First Amendment claims (Counts I and II) against Hilmer, Stegman, and Ryan, in their individual and official capacities, and against the Board; and Plaintiffs' state constitutional and state statutory claims (Counts III and IV) against the Board and all individual Defendants sued in their individual and official capacities.

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment [Doc. 52] is **GRANTED in part** only with respect to Plaintiffs' federal law claims against Defendant Silvernail in his individual capacity.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment [Doc.

52] is **DENIED in all other respects**.

**IT IS FURTHER ORDERED** that a **final pretrial conference will be held in this case at 9:00am on Thursday, January 14, 2010.**  Training on the electronic evidence presentation system in the courtroom will be provided after the conference.

A separate Judgment shall be entered in accordance with this Order.


 /s/ Thomas C. Mummert, III

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of January, 2010.